Good morning, Your Honor. Chuck Michel appearing for the Mickey California Rifle and Pistol Association Foundation. You may please record. First, I'd like to clarify, the CRPA Foundation is here on behalf of neither party. I understand that. I understand that. Your position is supportive on the Second Amendment issue, but not on whether we should proceed in this case. I would like to take, I know I only have 10 minutes, so I'd like to make sure that I can cover why this case I believe is now moot, why there are other cases that I believe, both under the rules and in the Court's discretion, has priority, and why this case is not justiciable for a multitude of reasons, some of which I had hoped to be able to address after Mr. Gorsuch. I know, and I'm sorry about that. We have other obligations today. Oh, I certainly understand, Your Honor. It's not the Court's fault. But so I'll do my best. So in terms of mootness, to the extent that I can figure out exactly what this complaint challenges, it seems to be challenging, at least in some respects, that the Sheriff's policy requires some kind of a special need, a heightened standard to get a license. And let's keep in mind, the question that my client, CRPA Foundation, wants to get answered is not whether or not you're entitled to carry a concealed firearm or you're necessarily entitled to a license to carry a concealed firearm. It's actually whether there is a right to carry an arm for self-defense under the Second Amendment. That's different. Our position is you can ban open or you can ban concealed carry, but you can't ban both. You have to allow some manner to carry. Now, if the plaintiffs or if the appellants are challenging Publicly. In public, outside the home. Outside the home. Well, inside the home as well. But bare means carry, and that's what Heller says, which I can get back to. But just to finish up the mootness point, the Sheriff has changed twice. Now, I think as a matter of technicality, the Sheriff's, the new Sheriff's name should have been substituted in if they were in their official capacity. That might have prompted a new Sheriff to provide a new answer because the Sheriff now recognizes self-defense as good cause. Sheriff Scott Jones. So I think if these, if they were denied because. Per se? Just if somebody says self-defense, that's it? Their policy says on their website, and I know it's not in the record, but it's, it could be, I think, judicially noticed, self-defense may be considered good cause for the issuance of a permit. Well, that was always true as I understood it. The issue was really the degree of specificity. Well, this is an excellent question for counsel for Sacramento. We chatted informally, and I don't want to go putting that on the record, but you can ask that. My understanding is, and also the plaintiff, the counsel arguing for the Richards case last Thursday in San Francisco. We had three cases heard last week in front of another Ninth Circuit panel, and that's the priority issue. But pointed out that. Well, this panel has priority because we submitted the case some time ago, so that's not the issue. But that doesn't take away from your mootness and other points. Right. The sheriff settled with, the Richards case was previously Richards and Sykes. Sykes was suing Sacramento. Richards was suing YOLO. Sykes settled with Sacramento because the sheriff agreed to accept self-defense as good cause. So if they reapply that as a state policy. I'm sorry, Your Honor. Is there any element, you talk about self-defense being good cause. Is there still an element of discretion that the sheriff can exercise? There are multiple elements of discretion in determining what constitutes good cause. Self-defense is not the only good cause. There can be all kinds of business reasons or smaller segments of sort of the self-defense parameter. The sheriff has to administer a number of different permits that can be issued for a number of different reasons, not just self-defense. But if they reapply. You have said this is moot. But if there is a presentation that I'm getting this for self-defense and the license is still denied, are you claiming that that is an unconstitutional exercise of discretion? Well, no. Our position in the Peruta case, which is up in San Francisco, is that you can save the constitutionality of the statutory regime by interpreting. You can use the doctrine of constitutional avoidance to interpret good cause to require, to be satisfied if someone claims a need for self-defense, their Second Amendment need for self-defense. You can avoid the constitutional infirmary issues by simply interpreting the statutory scheme that way. And that was argued, along with the Baker case, three cases up in San Francisco last week for three and a half hours. In fact, it was argued by Alan Gura and Paul Clement, the lawyers that actually argued in front of the Supreme Court on Heller and McDonald cases. So if they reapplied, the point is that if they reapplied now, at least with respect to Appellant Lau, he was denied, at least officially on the letter, because he didn't meet the heightened self-defense requirement of the old policy. So if they reapplied now, they would quite possibly get a win. Well, the letter seemed to have been a form letter, but it was pretty apparent from the comment on it, from the actual application and the comment written on it, that he was actually denied because he was. There were other issues, yes. Right. And who knows what. I mean, mental. Well, it's fairly obvious what, yes. Right. I don't think that without perfecting that application, I don't think he has standing. I don't think it's judicial. With respect to the priority. Well, he did perfect it, and he does have standing. I mean, his position. Well, I don't know if he did. We haven't decided that. But he did perfect it. Unlike Mr. Miele, he did perfect the application, and it was denied. Yes, but we still don't know exactly why. Well, that's true, but that depends. I mean, you're sort of assuming a conclusion, which is that the limit of the Second Amendment right is self-defense, and that may well be right, but he could be arguing for something broader. That is simply a right to carry. Well, see, and that's another reason why I don't think this case is really ready to be decided. Because I don't understand, and I don't consider myself particularly accused. I tried. I can't figure out what the claim is. Why is it unconstitutional? What is unconstitutional? Is it unconstitutional because you can't require a license at all? Is it unconstitutional because this has become some kind of a prior restraint where there's too much subjective discretion given to a licensing administrating authority for a license to exercise a Second Amendment right? So in terms of your position, is your position that it's okay to have a license? It's okay to require a license. Require a license. The legislature has the discretion to set up a regulatory scheme. It can just allow open carry and ban concealed carry. It can just allow concealed carry and ban open carry. It can require a license for one or the other. It can have time, place, and manner restrictions. It just can't ban both or all manner, essentially, of public carry because the Second Amendment guarantees a right to keep and bear arms. And the Supreme Court looked at what bear means and said it means carry. And it adopted the language from Justice Ginsburg and the Muscarelle case. So you're essentially saying on its face the statutory scheme is okay. As long as it's constitutionally interpreted, yes. The statutory scheme. It's a little confusing because the statutory scheme is then manifested through a policy. The policy applies to the statutory scheme. The policy is then unconstitutional on its face if you're doing a constitutional avoidance approach. Kagan. Yes. In your view, then, would ‑‑ if the self defense requirement requires some proof, i.e. are you saying anybody can say I want it for self defense because, you know, there's gun violence and there's violence in the world, so if I want it for self defense, I get it, or are you saying that individual, that it's okay to apply it with individualized determinations of whether a particular person needs it for self defense? Well, I think the only individual determination would be whether or not that manifest, that reasoning was sincere. If someone genuinely wants a firearm, a license for self defense. And doesn't have some disqualifying factor, like criminal background or something. The objective criteria are a different aspect. We don't deal with those at all in the Peruta case. I'm not sure if those are being raised here. I know that Mr. Lau's other reasons may implicate some of those other criteria, good moral character, training, psychological testing, background check. None of that is ‑‑ But your self defense theory is a non‑individualized notion of self defense because anybody can get a ‑‑ somebody attack you at any time. You can't require special need. You can't require ‑‑ there's no, like, one free dog bite. It's not you have to wait until you're attacked and then your self defense needs. But that functionally means there is no criteria, at least of that functional criteria, because anybody can say self defense. They have to be honest about it. I mean, they could require a declaration under penalty of perjury that says I need it for self defense. There are other reasons. It's not even I need it. I want it. I mean, if you need it, you'd have to prove something about why you need it. You shouldn't. If you have a right, you don't have to prove anything to exercise it. And that's what Justice Light pointed out in the Woolard decision. I mean, if this is a fundamental right, which it is, and Heller and McDonald were watershed cases, you don't have to justify a need to exercise that right. If I could just briefly discuss, and I know the Court knows its own housekeeping rules, but it seems to me that General Order 41 and the Advisory Committee note on 34.4 say that when one panel withdraws submission ‑‑ Ginsburg. Yeah, but we resubmitted it. It was resubmitted. But it's ‑‑ We resubmitted it. Is it under submission right? It's not under submission right. Well, okay. You understand what I'm saying. I don't need to belabor the point. It seems, though, that this is going to be resubmitted after this, and there's another panel that's already been submitted. Well, I don't know what to say about Mr. Gorski. Ms. Michelle, you can go on for a minute or two, and then you should stop, and we will go to the other side. Has anyone heard from the panel's counsel? He called at what time? About 830? Could you call again, please? Go ahead. Well, Your Honor, I did listen to the oral arguments from the last session, and I picked up on some of the questions that the panel was asking there. I know with respect to whether or not the right extends outside the home, that's a fairly paramount question. Again, I don't think this is the right case. You're sort of putting the cart before the horse if you jump to that before dealing with all the other standing and mootness and those types of issues. But there's been arguments made by opposing counsel in related cases that the right is homebound, and you don't need to go much past the Heller decision itself and the text of the United States Constitution, Second Amendment, to understand why that's not accurate. The Heller decision is broken into sections. One section analyzes the scope of the right, not necessarily in the context of the piece of law. Right. Right. And it also, and then the second, the last section applies the scope of the right to the specific. All right. My final question is, do you have an articulation of a way? There's been post-Heller and McDonald several different attempts to articulate an overall approach. Do you have an overall approach? For a standard of review? Yes. Or substantial burden, or do we first look at how close this is to the core of the Second Amendment, and if we do, and then we then put a intermediate scrutiny on top of that, or is it, you know, and so on? Well, I believe that there's a couple ways that the court could do that. Or alternatively, could we do this simply historically by the fact that concealed carry laws have been, were generally upheld before the 14th Amendment, and this is a 14th Amendment case, and not do anything else? Well, the cases that the Supreme Court cited talk about concealed carry laws being held in the context of an allowance for open carry. I understand. There's not cases that say you can ban both. But here the challenge is only to conceal carry. So I'm sort of uncomfortable getting away from that. Well, I don't blame you. It seems to me if you want to challenge the other, you challenge the other. I don't. I tend to agree, Your Honor, except you have to look at it in context. I mean, if the State deprives you of the ability to carry openly, which they have done since this case was filed back in the beginning of this year, they limited that right. So if you look at the Peruta decision, that rationale is no longer applicable to the extent it said that because you can open carry, you don't have a right to conceal carry. They've eliminated the open carry. So now the only way that you can carry bare arms is with one of the licenses. So when that happens, under those circumstances, under that regulatory regime, the way to effectuate the Second Amendment is to allow self-defense to constitute good cause. Okay. Thank you very much. If Mr. Groski does not show up, Gorski, we won't let you do a rebuttal. Thank you. Thank you. Oh, okay. Thank you. In that case, let's wait a moment, if you don't mind. Okay. I must say this is a new experience for me. I was telling Judge Schroeder that I was once, as a lawyer, arguing a case in the California Supreme Court in Sacramento, and when we got there, the opposing was probably had gone to San Francisco and hadn't called. So we had the court call him, and sure enough, he was wandering the halls in San Francisco when the argument was. So he got to Sacramento in about an hour. I don't know how. And we had the argument. Mr. Groski. Yes, I apologize. We're from L.A. traffic. I'm used to it. I'm coming from La Jolla. All right. Well, I want you to ordinarily give oneself a little bit of extra time. In any event, we had Mr. Michelle argue first. You may argue now. Mr. Groski, please. I'm appearing on behalf of Mr. David Mel, and Mr. Lock Lowe. It would be helpful to begin by telling us something about where this case sits at this point. One thing, I noticed that your supplemental brief does not mention Mr. Lowe. Is Mr. Lowe still involved in this case? Yes. Is he still interested in the license, et cetera? Yes, Your Honor. Mr. Lowe is. I believe there's a third party that that person is no longer involved in this case. It was Mr. Frank Flores. There were two plaintiffs at the time of the last argument, as I understood it, Miel and Lowe. And it just struck me as a little odd that your supplemental brief did discuss Miel at some length, but Lowe not at all. So I wonder if you The reason I spent more time on Mel issue, Your Honor, because this Court, last time we were arguing, you had an issue on standing about did he apply, why didn't he appeal. And so I spent more time on that. Mr. Lowe did the whole, put his application in, and I thought the reply brief handled a lot of that originally for Mr. Lowe. And I went through his records, and I explained that there's a prima facie good cause standard that the Sacramento County Sheriff's Department uses, that that should have been applicable to him anyway. And that prima facie good cause standard basically says friends and family of law enforcement automatically get a presumed good cause issuance for CCW. It's not applicable to anyone else. So there's this double standard that's applying, and it wasn't applied even to Mr. Lowe, even though he was prior law enforcement. I think one of the other issues in Mr. Lowe's case, and I pointed out also in a reply, was that they use his post hoc reasoning to deny his application here today. All right. Another question is that Mr. Michelle suggested that, well, first of all, noted, and it seemed obvious to me as well, that the Mr. Blanas is no longer the sheriff. Is that right? That's correct. All right. There's a new, there's been a couple new sheriffs since then. And a lot of your complaints were about the administration by Mr. Blanas. So what do we know or what do we need to know about the current administration? This case is only an injunctive case. Is that right? No, Your Honor. It's also injunctive and also for damages, because the actual denial was for either one of these individuals to apply with a written application. When Mr. Blanas has oral applications for a CCW under his policy, and that's in the deposition transcript of Mr. Blanas, and I point that out, he has a oral policy for CCW. He has CCWs for friends and family of the sheriff. He bypasses the committee that he appointed sometimes. And I can give you the citation. All right. Let me ask you something. Do you have any interest in our deciding the underlying Second Amendment issue, or are your clients primarily interested in these cases or the issues specific to what was happening under Mr. Blanas when Mr. Blanas is no longer the sheriff and you're talking about not a policy, not a current policy and not the statute, but simply what Mr. Blanas was doing? Is that basically what this case is about? No, Your Honor. It's a twofold thing. One, they want to be treated fairly from the get-go, equal. Okay? This is more of an equal protection case. But the Second Amendment issue comes into play because it involves a fundamental right under the Equal Protection Clause. So, therefore, a higher standard of scrutiny must apply in judging this case. My clients want their day in court with Mr. Blanas. They're entitled to that. So you're no longer interested in injunctive relief? We are interested on the statute itself, dealing with the honorable peace officer exception to the CCW policy. That's the injunctive relief we're seeking there. Is your primary ---- Are you saying, Mr. Gorski, are you saying that the application of the Second Amendment here through the 14th Amendment is through the Equal Protection Clause or through the Due Process Clause? It's both, Your Honor. The complaint completes both. It's the procedure that they use. It's not equally applied. For example, an honorably retired peace officer, when they retire, they get a rubber stamp. All right. So you're not challenging the fact that in order to conceal carry in California or to carry in California, you need to get a license and you need to have a reason and it needs to be self-defense. None of that is your concern. It is my concern, Your Honor. But on a peripheral, the impetus or the thrust of the argument here is equal protection. Okay? I believe that there should be a licensing scheme. I believe that everyone should be held to the same standard for firing a handgun, safety reasons, things like that. I understand that. I don't want someone out there thinking that they're Bruce Willis and trying to defend everyone in the grocery store who's never fired a handgun in their life. That doesn't make sense. Okay? My understanding ---- Your complaint is that under this scheme, some people get permission to carry and your clients don't because they fall into these exceptions, one of which is being a retired police officer. Correct, Your Honor. And that is primarily an equal protection challenge. Correct, Your Honor. And is your position that the distinction between your clients and these other categories lacks rational basis? Well, it lacks rational basis because, I mean, even under this Court's holding in Silvera, in that case, dealing with the honorable peace officer exception to the assault weapons ban, this Court struck down that law with no rational basis. Here we have a ---- that was pre-incorporation of the Second Amendment. Now we have a fundamental right. It's the right to keep bare arms. And I understand, you know, the core values or the core right is in the home. And as you start moving further away, it may diminish. But at the bare minimum, it's going to be intermediate scrutiny when it comes to individuals. In the Nordyke case, that dealt with the commercial dealings of firearms, a wholly different issue. But this case, there's going to be distinctions between where someone's driving out on the highway, for example, and they want to keep a loaded handgun in their car. Okay? As compared to whether or not they can take that gun out of the car, I mean, there's like a threshold there for when is it appropriate to be having a gun and when is it not. But the standard needs to be applicable to everyone. You just can't pick and choose winners and losers in the CCW issue scheme. I mean, I know down here in L.A. County, the sheriff was giving it to the movie stars, honorary badges, and this court's aware of that, I'm sure. You've got to take it away. You've got to take away the political incentive to be able to control this item. And that's what's happening here. So are you saying that because they are showing some favoritism, that everybody is entitled to? Either everybody's entitled to them or, more importantly, the same standard across the board. You don't have an oral application because I happen to be a big campaign contributor and maybe bought a house for the sheriff. I thought the person who got the oral approval was under immediate threat and he did apply and he did get an actual ‑‑ he did later. No, no, the application ‑‑ Not a few days, but a couple months to have an application approved. Did you read his application, Your Honor? His good cause, the emergency, was he wears expensive watches, I think $45,000, and he carries lots of money in his pocket. Okay? That was the emergency. The record is replete with those types of emergencies where those emergencies where people were rejected for that same reason. Can we go back to the standing issue with your clients? Mr. Meehl never did either fill out an application or, as he was invited to do, go in and meet with somebody. He didn't do that. There's two things that happened here, Your Honor. The first time Mr. Meehl applied for an application, he sends it in, okay, pays the fee. And they sent it back with a little sticker and said fill it out, but it also said, the application itself said that you could come in and fill it out with somebody. The application does not say that. It was a letter that Mr. Meehl then wrote a letter to the sheriff's department spelling out everything. And then he got a letter back saying you can either fill it out or you can come in. He didn't do either of those things. So why isn't that the end of it? He didn't do it. Okay. That's the first time. He waited a full year. He got a rejection letter not for not filling out the application saying, Mr. Meehl, your application is incomplete. They didn't do that. They said you didn't meet the good cause. Right, because they had a form. Well, he didn't have good cause because he didn't give a good cause because he never filled it out. Okay. And you're not saying, and your position is not that he didn't have to give any good cause. Right, because there's other standards that are applying to people who didn't have to give good cause either. I mean, his standing arises when he submitted a written application. But whether that had to go on that issue, Your Honor, a year later goes by, Mr. Meehl submits the application. But again, without filling out the good cause or going in or anything else. But that had been directed to do for the last year. He's filling out the application according to what the application says. He didn't create the form, Your Honor. That's a State form. Yes, but he was given the form says unless directed otherwise. And he had been directed otherwise. Not on the second application. It's a wholly new application process. Once he submitted the second application, here it goes as to what happened with the first application. The second one is a whole new cause of action right there. It doesn't describe him as somebody who really wanted to get his application, but Froe doesn't. But, Your Honor, I also, at that point in time, too, the deposition testimony of Amber Wong clearly states that the proper procedure for a CCW would be that either she, most likely she, or sometimes a detective, would call the person and tell them to schedule an interview to come down. So he had gotten a letter telling him to schedule an interview, and he didn't do it. No. No. The second application, Your Honor, when he submitted the second application, there was no response back to him. He paid the fee. They cashed the check. It starts the whole application process started all over again. What's the point of them having an internal policy that Amber Wong is supposed to contact the applicant to help them fill it out in the station so that she can witness it? What's the point of somebody who's been told to go and talk to someone not to do it? You're talking about the first application, Your Honor. All right. Let's go to Mr. Lau. So Mr. Lau did fill out an application and did get it rejected. And the official rejection was that same official form, which didn't really apply to him either, but it did say it was for lack of good cause. But you can look at his application and also at the notation on it and see that he had all kinds of problems. Other reasons not having to do with self-defense. Now, what do we do with that in terms of – I'm not sure it's a standing problem, but it may be a problem that limits his ability to challenge the self-defense or to challenge the denial when it appears that he would have been denied anyway. Well, Your Honor, that's a question of – that's a tribal issue of fact right there. And we're up here on the summer judgment orders on that issue. That's post hoc reasoning as well. And not only that, Your Honor, if they did have these problems with Mr. Lau, the application specifically states that if the agency wants, so they can mandate that you see a psychiatrist or psychologist for an evaluation. The government had that option. They didn't do it. So, Your Honor, we're getting into a deep area here too because that's a PTSD issue. There's going to be a lot of servicemen coming back from Iraq and Afghanistan with PTSD, okay, well-trained soldiers. Are we going to sit back and say each one of these disabilities, these people give up a constitutional right because they help the country out, because they have PTSD? I mean, the point is they're not in a position to be judging his PTSD. If they thought there was a psychological problem with Mr. Lau, they had all the legal remedies available to them. They could have made him see a psychiatrist for a psychological evaluation. They didn't do it. They're only saying that's the issue now after they got caught. But they sent him a form letter saying, hey, you didn't establish a good cause. We're not here on his psychological issues. That's a red herring. They rejected him for not having a good cause. And if their good cause standards immediate threat, I think Mr. Lau can show more immediacy than anyone else working for him. Assuming they have standing, do you want to tell us what your take is on the various tests that have been suggested after McDonnell? I don't know if they even apply in this case because you're sort of arguing an equal protection argument in which the Second Amendment issue only comes up through an equal protection fundamental rights theory. So I don't know whether the standard that would apply to a direct prohibition challenge, which this does not, would apply. But if it did, do you have a position on what the challenge is, what the standard is? Strict scrutiny, Your Honor. That's your position, strict scrutiny. Strict scrutiny, yes. Has anybody accepted that on a outside-the-home hearing? No, Your Honor, but Texas, there's like 36 states that have shall-issue policies. Does it have what policies? Shall-issue. Like the state of Texas, Colorado, even Nevada. I can go to Nevada right now and go get a concealed weapons permit in Nevada if I want one. In Las Vegas, I don't know if you know this, but you see motorcyclists driving down the strip and they have their handguns out on the side. They have open-carry laws, too, in Nevada. I mean... I'm not sure. Well, I guess my point is that the challenges are coming out of areas like New Jersey, New York, and California that have very strict CCW requirements. So it's not ñ there are more states that... Another question is that you're challenging anything but the CCW, i.e., are you challenging the open-carry laws in California? No, I gather. No. No. So what did the district court do wrong? The district court said that Lau does not dispute the fact that at the time he applied for the permit, he was mentally disabled from depression, PTSD, sleep apnea, and was unable to work. The committee assessing his application unanimously agreed to deny his application, noting that there were too many issues. He lodged an appeal, and the chief who interviewed him said that he was overly suspicious, paranoid, but he admitted it is ñ he didn't ñ he disagreed with that, but admitted in his deposition he had suffered from severe sleep apnea, causing him to feel drowsy, lethargic, and affecting his alertness and judgment. Now, and so those seem to be the basis for a denial. What's wrong with all that? Well, first of all, Your Honor, in the file itself of Mr. Lau, there's no documentation of that. It seems to me that law enforcement, if they had all these issues with Mr. Lau, it would have been documented. The only thing they brought was a sticky note that said too many issues, a very vague term, to say the least. But that's not what he was rejected for. Wasn't he also discharged from the FBI? No. He's on a disability right now, a full disability. In fact, there's only two psychologists that can treat Mr. Lau. He gets ñ actually, he's making more money now than he was working for the FBI. Mr. Lau is on a permanent disability. He lost his security clearance. He did not lose his status as an employee of the federal government. Technically, he's still employed. But after five years, they put you ñ roll you into, like, a permanency program. But that's not what ñ Mr. Lau was out on workers' comp and some other disability. Your Honor, I think the real question ñ What if strict scrutiny did not apply? How would that ñ what then would happen in this case? In other words, if you were ñ Well, I can tell you what should happen in this case is, one, the penal code section exempting retired officers where they don't have to fill out an application, don't have to do anything for the rest of their life, unlike the rest of the citizens of California. That's unconstitutional on its face. Okay? So that statute's struck down. The second thing is, Mr. Mel ñ And how does that help your clients? Judge Reinhardt asked me that, too. And the reason why these laws get passed, Your Honor, is because certain groups ñ Why does Judge Reinhardt have to do with this? Pardon? Why does Judge Reinhardt have to do with this? Because the same question was posed to me in the assault weapons ban case ñ Oh, I see. ñ on the equal protection argument. And how does it help protect your clients when you're not going to get their guns? What they do do is they change the laws afterwards because, well, we can't be this strict now on one group because the other group's not going to like us as much. And it gives more balance to the system itself. But ñ and also it's just a sense of fairness, Your Honor. I mean, we want equality across the board, not so that some groups are more deserving of a CCW than others. And the underlying policy here for the sheriff back then, which was a prima facie violation of the equal protection clause, was he himself said, if you're a friend or a family member of law enforcement, you have prima facie good cause to receive a CCW. So that sheriff's policy that was in effect at the time, which was applied to my clients, violated their rights because Mr. Lau was not allowed to move under a prima facie good faith or good cause issue. Mr. Mel was not under the presumptive category either. So when ñ when you look at it, you have the policy in place, but then you have the entire procedure as to how CCWs were issued by the Sacramento County Sheriff. Some were issued without a formal DOJ check. Some were issued on an oral application. Some were issued without the committee even getting involved. Some were issued after the committee had gotten involved and there's an appeal, but then the sheriff comes in and overrules the committee, overrules the initial investigator, and still has his friend, a campaign contributor, issued a CCW. I can give you the citations to the record for those, Your Honor. What are we applying strict scrutiny to? Is it to the ñ to the administration of the statute by the sheriff's office? Yes, Your Honor.  Okay. Your time is about up. Thank you, Your Honor. Thank you. And once again, I apologize to the court and counsel. Good morning, judges. May it please the court, my name is John Lavera. I represent the Sacramento Sheriff's Department and former Sheriff Balanus. It's the position of my clients, the appellees here, that the only policy that the appellant is raising that they claim ñ appellant's claim results in an unconstitutional application of the statute is the policy where ñ the alleged policy whereby campaign contributors are given some sort of preference in the decision on whether to issue a CCW permit. And it is our position that no matter how broad the Second Amendment may be or what standard of review or level of review is applied to the statute or the administration of the statute, that no matter what, when you come down to it, there simply isn't a Second Amendment implication or violation here due to the standing issues involving Mr.  And I'm not aware of any other case where the appellant was clearly told that he was to fill out the statute at the time and the statute now requires that the applicant set forth the reasons why they desired to. Well, it is a little unclear because it did say don't fill it out. But then he was told to fill it out the first time. He says he wasn't told the second time. So I don't know. Well, then after it was returned, then he, as the court has noted, received a letter from Chief. That was as to the first application. Then there was another application. I assume your position would be we should have known by then that he should fill it out. But, you know, you were told previously, hey, you need to set forth the reasons why in writing. And the code says you have to set forth the reasons why you desire the CCW. And you decide to just blow it off and not do it. But your letter did say don't do it. That's what's really bizarre about this. It said don't fill out Section 7 until you get in for an interview. But then the letter from Chief Denham says you need to fill out that information and resubmit it. We'll waive the filing fee and we will reconsider your application at that point. It's our position that he, you know, just decided not to follow that procedure. All right. What about Mr. Lau? Well, with respect to Mr. Lau, the, you know, the issue is one of when you look at the record here, the three committee members who evaluated Mr. Lau's application indicated he had too many issues. When he went before Chief Harris on his appeal, he submitted that evidence and more. The record shows that he submitted information about his disability, information about his discharge from the FBI, information of his own. Was he or wasn't he discharged? I was just told he wasn't discharged. Well, I don't know whether the term is termination, discharge. He was, his status is he's not working and he was not working because of a mental disability. According to Mr. Gorski, apparently now he is in a category of being permanently mentally disabled. The problem is in both instances you sent out, or not you, but your client sent out this didn't say you didn't file an application to Mr. Mayall and didn't say to him that you have, you're disqualified because of your mental health situation and said that you didn't get cause. So what do we do with that? Yeah, what I would say to that is these letters are form letters, basically. But when you look at, when you dig into the meat of the case and go to the individuals who are actually making the decisions, they said here's what was behind the decision to issue those form letters. But that's not a standing problem, right? It may limit the scope of what he can challenge, but it's not exactly, it's a standing problem. You could either look at it, I would submit in terms of standing because you haven't suffered. His complaint is that this whole procedure was an illegitimate procedure because, either because he's challenging this thing about the police or he's challenging the campaign contributions or he's challenging the whole Cary statute is unconstitutional. For any of those reasons, I suppose his position could be that there's, either I had a Second Amendment right or at least I have a Second Amendment right to a fair procedure and I didn't get one. But he went through the committee review process, the appellate process. I would say whether you look at it from a standing issue, in other words, you were not, because of the reasons for your denial, you were not exposed to the policy that you now place at issue and therefore you lack standing, or even if you have. Well, why wasn't he exposed to it? He was exposed to it. He applied for a Cary law and it was denied, for a Cary permit and it was denied. But he wasn't denied. There's no evidence to suggest that he was denied because of the local county policy that he was, the alleged policy that he was challenging, the campaign contribution distinction. He was denied for reasons other than that, so I would submit he doesn't have standing because he's not. So you don't think that this, do you think that this case in any way at all implicates the Second Amendment, the question of the standard applicable to Second Amendment Cary laws? I mean, under the Second Amendment to either concealed Cary laws or Cary laws in general or anything like that? No. It would be our position that no matter how the Court interprets the scope of the Second Amendment or the standard of review to be applied to the CCW statutes, it just doesn't matter in this case for standing issues related to Mel and either standing or if you don't, if the Court doesn't look at it in terms of standing, the actual reasons for the denial of Mr. Lau's application just don't implicate the Second Amendment or violate the Second Amendment. If you think it's okay to have a licensing statute for Cary laws, right? I mean, theoretically, you could have, I don't think this is the challenge, but you could have somebody saying you just can't have a licensing scheme. That's not this case. I suppose, but it's hard for me to answer that because in the case of Lau, my position is, my client's position is we never get there because the reasons for the denial, regardless of how the Department exercised its discretion or regardless of what the language of the statute say, if the basis in part, at least, is due to the fact that he's mentally disabled, under Heller, those reasons are presumed to be lawful. And in order to understand, one has to surmise that. I mean, all it says was too many issues, right? And when they said too many issues and the other guy said he seemed nervous or paranoid. Paranoid. But the information before Chief Harris was all of the information about his background. Right. I understand what you're saying. But it is an inference, but it's a pretty strong one. I would submit that when Excuse me. If you have a licensing law which has an element of discretion, do you consider that to be permissible under the Second Amendment or should the licensing law have mandatory qualifications to be licensed? Your Honor, it's the position of my clients that that doesn't matter in this case. And the Attorney General for the State of California has appeared in this action and I believe will be addressing those issues. We haven't taken a position on that because of the standing or standing issues or the failure to show any violation of the Second Amendment based upon the reasons for the denial of Mr. Lyle's application. So how much time is the State going to have? I'd like to sit down at this point. I'd originally agreed to defer 15 minutes to the State.  Thank you very much. Thank you. Good morning, and may it please the Court. I'm George Waters. I represent Kamala D. Harris, the California Attorney General. What I want to address today is what we addressed in the supplemental brief, which is what we think the Court requested, and that is the standard of review that would apply to Second Amendment cases. I cannot say anything about what happened with Mr. Lyle or Mr. Mill's applications because the Attorney General does not grant, deny, or review CCW licenses. We know nothing about that. So let me just summarize very briefly what I want to – I would say there's three points in our supplemental brief, and I'm not going to vary much from it, but let me just say briefly what those three points are. We believe that in Second Amendment cases, the Court should adopt a substantial burden test, similar to that adopted by the Second Circuit in DeCastro, where heightened scrutiny is appropriate only where regulations substantially burden Second Amendment rights. That's point A. Point 1. Number 2 is that we read Heller as not extending the right to possess operable handguns to extend outside the home. So on that level, we believe this is a straightforward case because California makes ample allowance for carrying a handgun in the home, actually also in one's place of business and on private property. Third, if the Court concludes otherwise, as the Second Circuit recently did in the Kuchelski case, and that is that some sort of heightened scrutiny should be applied here, we believe that the level of heightened scrutiny should be driven, the analysis should be driven by how close to the core of the First Amendment right the regulation is and that here we believe intermediate scrutiny is appropriate. So that's where we are. I want to start with asking you, is your substantial burden – is this test, do you think, the one that the panel in Nordyke originally – not originally, but in the Second Nordyke opinion adopted, or is it different because it has a second layer? Well, I think it is different than the – what the panel adopted in Nordyke because I think on the substantial burden analysis, one has to look very carefully at what the burden is, what the right – what the definition of the right is. And once that is done, the amount of scrutiny under intermediate scrutiny that would be applied would vary based on how substantial the burden was on the Second Amendment right in question. And I think – I think it is very similar to what happened in Kuchelski under a very different – a very similar statute. But I read – I read the first version of Nordyke, the panel decision in Nordyke as a – The second panel decision. I'm sorry. The second panel decision. The panel decision that – Wait. I'm back. I apologize. The one that resulted in an en banc hearing. Okay. All right. That panel decision as, I think, being a more rigorous test. I do believe that there – it appeared for me reading that decision that what they referred to as heightened scrutiny would ipso facto be triggered under a substantial burden test, and that that burden would be something akin to strict scrutiny or close to it. That's how I read it. We're looking at a quiz. Well, it seemed to say if there was a substantial burden, it was pretty much no good. I mean, I think that's what they were saying. Right. But I think, yes, that's how I read it. So tell me where – I mean, this notion that – I gather you're position A, which is not the one the Second Circuit adopted, is that the right is limited to the home and, therefore, there's no substantial burden if you're burdening the right, not in the home. In a nutshell, that's it, Your Honor. But as Mr. Michel pointed out, the discussion in Heller of the statute and the meaning of the word bare arms, words bare arms, and there was a reference to an interpretation by Justice Ginsburg sometime before, which the opinion, the majority opinion in Heller says is the right interpretation, and it seems not to be limited to the home. And there's a lot of discussion about self-defense in general. I agree. And a lot of the historical discussion seems to be about self-defense in general. Your Honor, I agree with those statements. Our position on Heller and whether the right extends outside the home, I think I would describe it as not deeply analytical. The fact of the matter is that the – Isn't it deeply analytical? Your position isn't deeply analytical. Well, yes. Let me just say that there are, I think, half a dozen Federal district courts and also the Supreme Court of an eastern state, whose name I have now forgotten, have reached that conclusion. What conclusion? That the Second Amendment does not – the Second Amendment right as defined in Heller does not abide – does not extend outside the home. Each one of those cases has gone on to reach an alternative conclusion that even if some form of heightened scrutiny applies, that the individual statutes in question there meet that form of heightened scrutiny. I just have a question. How if you buy the historical and other accounts in Heller, which, of course, we're obliged to do, you could say that? Because – or put another way, how one could predict that the Supreme Court would say that, which I don't usually like to do. But in this instance, that's sort of where we are. And after Heller, it seems like a hard road to home. Well, I think, Your Honor, and I might disagree about that. But to state my position clearly, both Heller and McDonald are – the facts of those cases concern the possession and use of the firearms within the home. Right. Traditionally, cases are not interpreted as deciding issues that are not presented. We think that if some court is going to reach the conclusion that the Second Amendment applies outside of the home, if the appropriate court to do that would be the Supreme Court, and it has not done so. But your second position is that if there is a right here, if there is some application of the Second Amendment here, it's sort of a noncore application, which would be subject to intermediate scrutiny, which would not be a substantial burden or be a substantial burden that's subject to intermediate scrutiny, which would survive. Our position is that because Heller has defined the core right as being within the home, this is by definition not the core. I understand. Okay. And that, therefore, that there is, for that reason, no substantial burden. But I will say that Kitchell's view – I'm asking for a backup. Your backup position, the Second Circuit, is the Second Circuit position. The Second Circuit reached a different conclusion. They reached the conclusion that there was a substantial – that the right is just outside the home, and that the regulation there in New York, very similar to the regulation here, triggered intermediate scrutiny. They applied intermediate scrutiny. That's the framework of their analysis. And if you did that, or if they did that, what do you do with it, as Judge Roth asked, with the discretion here? And that's an unusual – I mean, it's not unheard of, certainly, in other constitutional areas, but it's somewhat suspect, perhaps, the fact that there seems to be a real looseness of the – in the application – in the enunciation and application of the standard. I think in the discretion aspect, this case is on all fours with the Kitchell's case. There, as the Court there said, there is considerable discretion by the licensing officers. The licensing officer's decision is subject to review for, I think, whether it's arbitrary or capricious. But the Second Circuit found that – found that licensing procedure to be appropriate and constitutional there. I will say that I personally believe that the Second Amendment – I mean, we are dealing with guns. I think everybody agrees that guns pose certain dangers. I think that with the discretion here, that the appropriate official to be deciding whether or not, in an appropriate county, someone should have a license to carry the handgun anywhere, a loaded handgun, is – it makes sense to have the sheriff, someone who is most familiar with law enforcement in the county, to be making that decision. As I said elsewhere, I think it's a virtue rather than a vice. It is, I think, not common in other constitutional areas, but I don't think it's unheard of. Well, the Supreme Court in Heller said that, like most rights, the right secured by the Second Amendment is not unlimited. Correct. And then they went on to point out that – that the right was not a right to keep and carry in any manner whatsoever. And the majority of the 19th century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment. Correct. So are you saying that under Heller, if a – if a prohibition – do you rely on that holding in Heller or not? We do, Your Honor. And let me – I mean, we're trying to be forthcoming here. Yeah. Right. I mean, to the extent that this is a concealed weapon case, I think that, to me, that decides it right there. The fact of the matter is – Well, why does it decide it right there? I mean, if a majority of the courts decided X, that doesn't mean that X is – it doesn't say we agree with X. It didn't say what they thought. Correct. To the extent that we're trying to figure out what the Supreme Court would do here, I take that as a statement that the Supreme Court would not. They're doing a historical analysis. I do think – I mean, I don't pretend to understand the historical analysis in Heller completely. I mean, I'm not – I'm not that person. But I do know that it discussed the situation in England and the United States before the Constitution and then in the run-up to the 14th Amendment. And the fact that there was evidently an agreement there that states could regulate, license, or bar the carry of concealed weapons I think is extremely important here. The point I was trying to make earlier is that California, to be candid, also requires a license for the carrying of a publicly – a non-concealed loaded handgun. I'm not sure that is an issue in this case, but the licensing procedure applies to that. So, I mean, to get back to where I started, seeing as I have 19 seconds left here, is that I think you have to look to the core of the right, as defined in Heller, and decide how deeply this cuts. And we believe that it does not cut deeply and allows ample ability to carry handguns outside the home. Okay. Thank you very much. Thank you for your assistance. Let me note that I am getting full audio, but my video has frozen. We're trying to get that fixed. I'm hearing everything, so there's no reason not to proceed. Okay. We'll get it fixed, meanwhile. Thank you. Yes, Ms. Cho. Good morning. My name is Samantha Cho on behalf of Amicus Law Center to Prevent Gun Violence. As Heller tells us, the Second Amendment codified a pre-existing right. To determine the scope and the meaning of the right, one must look to the history. Let me back up a minute. Could you briefly comment on what you think all of this has to do with this case, if anything? Based on the comments today and based on the comments in the briefing, I understand the challenge to be to the statute itself, which does give discretion to the local law enforcement to grant or deny these licenses. And in terms of the comments of the CRPA Foundation, saying that it's constitutional as long as ‑‑ Could you speak up a little bit, please? Okay. Sorry, Your Honor. In terms of the comments of the Council for CRPA Foundation, saying that it's ‑‑ the statute is constitutional to the extent that it is interpreted to ‑‑ the good cause requirement is interpreted as equivalent to self-defense, that's just, I think, that equates to an argument that it's only constitutional if it's interpreted in a way that the permits are to be issued in all cases. In the founding era, both open and concealed carrying of weapons were widely banned, and several states had enacted statutes that did so. Therefore, the Second Amendment was not understood to encompass the right to publicly carry a gun. Because California's concealed carry law is part of that longstanding tradition of reasonable state regulation of firearms, it is outside the Second Amendment's purview in this Court to uphold the law. So is your position that we essentially look at the history, decide that this was an assumption either, what, 1789 or in 1868? I don't know which one. I believe it is ‑‑ primarily you would look to the period of the founding and look at the ‑‑ And that would be it. In other words, we wouldn't then start with substantial burdens or intermediate scrutiny or anything else. We would simply say, was concealed carry part of the right? No, it wasn't the end. I think that's correct, Your Honor, that you do start with the historical analysis, and if you do find that, and you would only move to the second step if you found that it was ‑‑ there was some dispute about it. I often wonder where the Supreme Court got its competing historical analysis vote, other than in Heller, in which it seems to me the majority opinion maybe is not so consistent with your representation, but it wasn't really what they were writing about. Where would we look for all this? Do we sit around and read every statute from 1789 or what? Well, we tried to brief some of those statutes, too. I'm sorry, I'm not hearing you. We did ‑‑ we did brief some of the statutes in our brief. Well, right, but if you were going to really come to this conclusion, you'd have to do a serious job, and I don't know whether there's secondary sources that have done this or what. There are historical sources that have done this, and we have cited a couple of those. There are articles by Patrick Charles, and there's also an article by Saul Cornell, who are both historians that have analyzed this issue very extensively. And in terms of expansive interpretation of Heller, to create a broad right to carry guns outside the home is just unjustified. As Judge Schroeder pointed out, Heller recognized that the most of the 19th century courts ‑‑ Well, here is to voice your views. How do you go about it, if you don't have a gun, and you just walk around your house with a gun? Well, that's one meaning, Your Honor. But as traditionally understood, you could carry your gun outside your home if you were called up for military service, and the fact ‑‑ the public home distinctions is not unique to the Second Amendment. For example, in the case of Stanley v. Georgia, the Supreme Court ruled that the in-home possession of obscene materials could not be criminalized, even as it assumed that the public display of such materials could be criminalized. So just because the words home or house does not appear in the text of the Second Amendment does not dispose of this issue, especially considering the historical background of gun regulations at the time of the founding. And in the decades following the founding. But even if this Court were to disagree with our position here, that the Second Amendment does not protect the right to carry a gun outside the home, that is not outcome determinative, because California's concealed carry law would survive intermediate scrutiny, which is the level of scrutiny that is most appropriate here and chosen by the overwhelming majority of the courts that have addressed this issue. The level of scrutiny chosen by this Court must allow legislatures the flexibility to respond to the danger posed by guns. Such flexibility would be afforded by intermediate scrutiny, but it would not do so if the standard was strict scrutiny. In fact, strict scrutiny is inconsistent with Heller's assurances that legislatures must be allowed to employ a variety of tools for combating the problem of gun violence. It is also at odds with Heller's recognition that some regulations are presumptively lawful. And it is simply not the case that labeling a right as fundamental always merits strict scrutiny. Strict scrutiny does not apply to all regulations that regulate speech, even though we would all agree that free speech is a fundamental right. For example, content-neutral restrictions, time, place, or manner restrictions only merit intermediate scrutiny. And it would make little sense to subject all gun regulations to strict scrutiny when regulations restricting free speech are not all subject to that rigid test. This is not because the Second Amendment is some second-class class of rights, but because state regulation under the Second Amendment has always been more strict than other enumerated rights. As the Katulski Court wrote, no law could strip felons who are mentally ill from speaking about a topic or to exercise their choice of a religion. But the prohibitions on firearm possession by the same people is permissible, as Heller expressly tells us. For similar reasons, prior restraint doctrine would be a poor fit with the Second Amendment because the amendment was enacted against the legal backdrop in which the existing gun regulations essentially were prior restraints. Again, as Heller says, the Second Amendment right was enshrined with the scope they were understood to have when it was adopted. And prior restraint is also inconsistent with Heller because prohibition of guns in government buildings of prior restraint was deemed presumptively lawful without so much as an inquiry as to whether whenever someone walks into a government building. So what about the discretionary aspect of this law? I mean, it seems pretty easy to argue that if there were established criteria and they were applied, that given the dangers of concealed carry outside the home, that it would probably pass any form of intermediate scrutiny. But what about the discretionary aspect? The granting of the discretion to law enforcement is a choice made by, a policy choice made by the state legislature that local law enforcement would have the best means available to decide which persons would be the issuance of the concealed carry permits would be permissible and would be prudent under the local conditions. So that's a policy choice made by the state legislature that is substantially related to a compelling state interest in trying to combat the threat posed by guns. But if the Second Circuit case was the same, I mean, here I gather that it isn't sufficient to say I want the gun for self-defense. You have to give a specific reason to yourself why you are in danger, essentially. Was that true in the Second Circuit and in New York as well? I believe so, Your Honor. I think you had to present a special need above the needs of the general public. And in terms of applying the intermediate scrutiny here, it's clear that California's concealed carry law would pass it. First, California has an important, if not compelling, interest in safeguarding the public and preventing crime. Second, the law furthers that interest by limiting concealed carry of deadly weapons to persons who can articulate a good cause for publicly carrying a gun. And in conclusion, the risk of miscalculating and extending the right to bear arms beyond the narrow confines recognized in Heller is very high. The longstanding history of gun regulations established that no such extensions are warranted here. I'm sorry. I didn't hear that. I'm sorry. The longstanding history of gun regulations established that no such extensions of the right is warranted here. The law center respectfully urges this Court not to hamper the ability of State legislatures and local law enforcement to combat the threat of gun violence. Thank you.  Thank you very much. Thank all of you for your arguments. And the case of Mayo v. Blattis is submitted.
judges: Schroeder, Roth, Berzon